**George D. JOHNSON, Appellant,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Appellee.**

**No. 8708.**

United States Court of Appeals
Tenth Circuit.

Nov. 9, 1966.

---

6. Supra note 2.

**910**

James P. Johnston, Wichita, Kan. (Clarence R. Sowers, John W. Sowers and Davis S. Carson, Wichita, Kan., on the brief) for appellant.

Robert C. McDiarmid, Atty., Dept. of Justice, (John W. Douglas, Asst. Atty. Gen., Newell A. George, U. S. Atty., and David L. Rose, Atty., Dept. of Justice, on the brief), for appellee.

Before PHILLIPS, LEWIS and HILL, Circuit Judges.

HILL, Circuit Judge.

Appellant, pursuant to section 405(g) of the Social Security Act, 42 U.S.C., filed suit below for a judicial review of a final decision of the Secretary of Health, Education and Welfare denying his claim for the establishment of a period of disability and for disability benefits. The District Court affirmed the Secretary's decision and granted the Secretary-appellee's motion for summary judgment. From that judgment, appellant takes this appeal.

Appellant is 47 years old. He has been blind in his right eye since he was five years old. He has a congenital bilateral club foot deformity. This forces him to walk on his heels with his feet pointed out at 45 degree angles—in a "v" shape. In May of 1963, appellant applied to the Secretary for a period of disability benefits.[1] In order to receive them, appellant had to prove that, prior to August 1, 1963, he was disabled within the meaning of the Act. The provisions then applicable, 42 U.S.C. §§ 416(i) and 423(c) (2),[2] defined "disability": "The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration * * *." Appellant satisfied the other requirements of the Act and, in order to receive benefits, had to show only that because of a medically determinable physical or mental impairment he was unable to engage in substantial employment. Appellant's claims were denied and he requested and was granted a hearing before a hearing examiner on February 8, 1965. In his request for a hearing, appellant states that:

"The intense pains in my feet— whether they be spurs or nerves—is great enough that it distracts my attention no matter what I am doing. My feet hurt all the time even when I am laying on a bed and I cannot stand on my feet for very long periods at a

---

1. Some applications were made earlier and were evidently also considered by the Secretary. They were made for the same reasons as the May, 1963, application, however, and have no special significance.

2. These sections were amended in July, 1965—after appellant filed his action.

time. I cannot squat more than twenty minutes without having severe pain."

At the hearing, a number of exhibits were introduced into evidence and the Examiner questioned appellant and Mr. Bentley A. Barnabas, the director of a vocational placement service in Wichita, Kansas.[3] From appellant's testimony taken at the hearing, it appears that although severely handicapped, he is industrious, very bright and a hard worker. Over the last thirty-odd years, he has done a variety of jobs in an effort to earn a living. After completing 12 years of school and working on a farm until he was nineteen, he left the farm and for the next six years worked at many jobs, from circus roustabout to cook.

From 1942 to 1951 he was a self-employed farmer, but because of crop failure and a "nervous breakdown" had to leave the farm in eastern Kansas. He went to Wichita, Kansas, and, from 1951 to 1958, he was employed by the Boeing Aircraft Company. His legs and feet were bothering him a great deal during this time. In 1957 his first wife died, leaving appellant to care for seven children. Because of his continued absences from work, appellant was fired by the Boeing Company in 1958. Appellant then dug basements and ploughed gardens with a tractor left over from his farming days until it wore out. Then he developed a small egg delivering business but could not compete with the larger stores' egg sales and was forced to find another means of livelihood. He tried raising and selling garden vegetables and rabbits for a while but had to stop because of pain in his legs. For the last few years appellant has been collecting junk—going to the local dumps, picking up scrap metal, taking it home, burning it clean, separating and selling the various metals.

Appellant testified that in 1960 the Kansas Vocational Rehabilitation Service sent him to a business college. His intelligence quotient was tested and found to be 130.[4] At the school appellant would do quite well in classes on one day but would do poorly the next. He finished only 10 of an 18 months course. He attributed this to frustration he would feel at times: " * * * this idea of going to work somewhere and being 8:00 to 4:00 every day at a steady grind and something coming up and frustrating me, why I couldn't—I'd blow up." Appellant's "frustration" was apparently in part caused by the pain he suffers. When asked why he did not re-enlist the aid of the Kansas Rehabilitation Service, go back to business college and let the state agency find him a clerical, sedentary job, appellant replied: "I don't think they can do it." Then the Examiner said: "Well, you never gave them [the Rehabilitation people] a chance." And Johnson replied: "I feel like I have. I've done what I was supposed to do except to finish the school under those conditions—handicapped—that is, I tell you something like that is just like one man looking at a rabbit and telling how far he can jump. It just doesn't make sense because the rabbit knows whether he can move or not surely." Appellant further testified that the reason he could no longer make any money at the junk business[5] was because he could not stand the pain he suffered after he had been working at cleaning and sorting metals for a while.

Among the exhibits admitted at the hearing were reports from three physicians. In 1958, Dr. Max Teare recommended to appellant's employer that he be assigned to work that would allow him to sit 50 per cent of the time. In 1959, Dr. E. N. Tihen reported that appellant has had only light perception in the right eye since age 5. He also reported that appellant had a bilateral club foot deformity with atrophy of the muscles in the lower half of his legs. Dr. Tihen felt that appellant was unable to perform

---

3. Appellant's wife also made a few comments to the examiner. They are not significant here.

4. This places appellant in the upper 2½ per cent of the population.

5. Appellant netted around $100.00 in 1963.

work involving use of his feet or prolonged standing or walking. Dr. J. F. Lance submitted two reports on appellant. The first was in 1960. At that time he reported that appellant had had difficulty with his feet all his life; that he bore little weight on his fore-feet and as a result the heels became calloused and painful; and that if appellant could be placed in a position where standing and walking were at a minimum, he would be able to continue working. On July 15, 1963, Dr. Lance again examined appellant. That examination revealed:

"A forty-six year old white male, who walks with marked limp on both feet, having no power of plantar flexion in the ankles. He walks off of the heels entirely. There is marked atrophy of both legs. The calf on the left measures 9½ inches, and on the right 8½ inches in circumference at the ankle. There are healed scars of previous surgical operations. The heels are broad. There is a cavus deformity in both feet. The toes touch the floor with weight bearing, but he carries no weight under the metatarsal heads. Both ankles dorsiflex well to 60 or 70 degrees, but plantar flexion is limited on the right to less than 90 degrees, and on the left to 90 degrees. The heels are calloused. There is little if any motion permitted in the subtalar joint, right and left."

Dr. Lance concluded his report: "I would consider Mr. Johnson as unemployable, and I would believe this to be a permanent situation."

In addition to appellant, Bentley A. Barnabas testified at the hearing. Mr. Barnabas holds a B.A. degree in business administration and an M.S. degree in industrial psychology and is a vocational expert. The Examiner propounded a hypothetical question to Mr. Barnabas. The expert was told to assume that the claimant is 47 years old with an I.Q. of 130, that he has a high school education and 10 months of business college, and that he is blind in the right eye but has adequate vision in the left. The vocational expert was also told to assume that "* * * this witness cannot do any type of work which involves very much walking on the job, and it's got to be a sedentary type of job. That he's got to sit and although he can get up and walk occasionally, and, of course, you have seen him walk to the door and back, let's assume that's his normal method of walking." The examiner additionally instructed Mr. Barnabas to assume that the claimant could not drive.[6] The examiner concluded his question: "Now, taking these assumptions, and the medical assumptions are fairly simple, because they involve this job without any walking and he's blind in his right eye, is there anything that this individual can do in the way of substantial gainful activity?" The examiner did not include in his question any element of pain. The vocational expert answered this question in the affirmative and then explained to the examiner many of the jobs in the Wichita area which he thought appellant could handle. Among them were inspection jobs, appliance repair work, material inventory clerk, accounting and assembly work. In all of the jobs mentioned, the worker remains seated most of the time. Although the examiner did not mention pain in his "hypothetical" question, Mr. Barnabas volunteered his opinion about pain. He said: "Well, in some of these routine jobs, such as simple accounting clerk, or bench repair work, I would take into consideration the fact that if he took any type of sedation to free him from the pain that he then would not be as bright as if he if he—Affects or so I am told by consultants that various sedatives is to reduce the level of intellectual—oh, of alertness. Now, this might be bad in the case of inspection. It might create problems in the case of complex accounting tasks, but for the simple ones, an accounting clerk, a material inventory clerk, a bench repair worker, this would not interfere with his ability to do the work."

6. Although appellant does some driving on the back roads when he is gathering junk, he has no driver's license and he can manipulate the pedals of the car with his heels only.

The examiner then asked Mr. Barnabas whom he referred to as "consultants". Mr. Barnabas replied: "I mean when we are talking with a client about some, this is general experience, not specific. When I'm talking with our medical consultant about a person who is in constant pain without sedatives what happens to his mind if he's under sedation. Well, it reduces his intellectual capacity somewhat. But I take into account Mr. Johnson if you'll forgive me, when I'm saying he could stand considerable reduction of his mental capacity, capacity [sic] and still be quite a bright individual."

This concluded the vocational expert's testimony. Appellant then explained to the examiner that he did not feel he could handle any of the jobs mentioned by the vocational expert because of the pain he suffers in his legs. The examiner's reply was as follows: "Well, let me say something to you: When I gave what I called the hypothetical question to the witness, [Mr. Barnabas] I didn't enter—put in any factor of pain because if you're in constant pain, that of course, presents another situation, but I'll have to decide that, and I'm assuming that there's no great element of pain, and that's the way I presented the question to the witness. Now, if I find from the reports that you're in constant pain it'll be another problem that I'll have to face when I'm making this decision, but I'm just telling you that—."

The examiner decided that appellant could engage in substantial gainful employment. This decision was based in large part upon the examiner's conclusion that appellant was not utilizing his superior intellectual capacity. He felt that appellant was "stubborn" and "unwilling" to do what other people—such as the Kansas Vocational Rehabilitation Office—had recommended.

Since the examiner indicates in his written decision that " * * * so long as [appellant] has to stand or walk for any length of time, it is going to be painful and place demands upon him which are entirely too much", and since he concluded that there was some employment in which appellant could engage, he has assumed that appellant can perform some sedentary task without experiencing the pain which disenables him to do the tasks he has performed in the past.

In affirming the examiner's decision, the District Court recognized the fact that "Plaintiff's claim for disability is based on pain—which is a subjective symptom. As such, it must be evaluated by the Secretary with due consideration for credibility, motivation and medical evidence of impairment."

In dealing with the contention of pain, the trial court said, "While the hearing examiner did not specifically put an element of pain in his question to the vocational expert, the examiner did in effect make pain a part of the question by saying: 'Now we'll also assume that this witness [the plaintiff] can not do any type of work which involved very much walking on the job. That he's got to sit and although he can get up and walk occasionally, and, of course you have seen him walk to the door and back, let's assume that's his normal method of walking.' " [7] The District Court found that

---

7. The trial court also said:
"Further, it is clear from the record before us that the vocational expert considered the element of pain on forming his opinion:
" 'Well, in some of these more routine jobs, such as simple accounting clerk, or bench repair work, I would take into consideration the fact that if he took any type of sedation to free him from the pain that he then would not be as bright as if he, if he—Affects or so I am told by consultants that various sedatives is to reduce the level of intellectual—oh, of alertness. Now, this might be bad in the case of inspection. It might create problems in the case of complex accounting tasks, but for the simple ones, an accounting clerk, a material inventory clerk, a bench repair work, this would not interfere with his ability to do the work.
* * * * *
" 'But I take into account Mr. Johnson, if you'll forgive me, when I'm saying he could stand considerable reduction of his mental capacity and still be quite a bright individual.' "

there was in the record "substantial evidence" supporting the examiner's finding that appellant could find substantial employment. See 42 U.S.C. § 405(g).

■ The principles governing review in a case such as this are set out in Celebrezze v. Warren, 10 Cir., 339 F.2d 833, and will not be repeated here except to say that we examine the record only to see if there is substantial evidence supporting the examiner's findings.

■ The trial court recognized that Congress has placed the task of making factual determinations in cases such as this upon the Secretary and his representatives. This court has held that these findings are conclusive and, in addition, reasonable inferences to be drawn therefrom are also binding on the courts if they are supported by substantial evidence. Gardner v. Bishop, 10 Cir., 362 F.2d 917; Dvorak v. Celebrezze, 10 Cir., 345 F.2d 894; Celebrezze v. Warren, 10 Cir., 339 F.2d 833; Gainey v. Flemming, 10 Cir., 279 F.2d 56.

In reviewing the record before us, we must bear in mind that "[e]vidence may be received at any hearing before the Secretary even though inadmissible under the rules of evidence applicable to court procedure." 42 U.S.C. § 405 (b). Thus procedurally there was nothing preventing Mr. Barnabas' testimony concerning the use by appellant of sedatives for reducing his pain. However, such testimony by a person untrained in medicine and its effect upon the body is not entitled to and should not receive very much weight. And while the expert opinions of physicians as to disability are not binding on the examiner an expert opinion to that effect which is not seriously controverted by substantial evidence to the contrary supplies this court with a proper ground for reversal.

Appellant testified that his pain had increased over a period of time and had become so severe that he could no longer engage in his junk collecting business. In July of 1963, a physician, Dr. Lance, concluded that appellant was not employable and that he believed this to be a "permanent condition". This was a different conclusion than that he reached in 1960 when he found appellant could be employed if standing and walking were at a minimum. These findings support appellant's contention of an increase in the amount of pain he suffers. The other two medical reports on appellant were made in 1958 and 1959. In view of appellant's claim of increased pain, only Dr. Lance's report of 1963 was, in point of time, close enough to the examiner's hearing (February 8, 1965) to be of much validity. And that report's finding of disability was contradicted only by Mr. Barnabas' testimony.

The government indicates that at the time Dr. Lance examined appellant, he was not "aware of appellant's high intelligence or abilities and training for sedentary jobs." The government then says that appellant would not suffer any pain if he stays off his feet most of the time—a conclusion supported by no evidence. Even if appellant suffers pain while sitting, says the government, the vocational expert has testified that appellant, because of his high intelligence, can take sedatives which will not interfere with his ability to do many of the jobs the expert has indicated appellant could do. Mr. Barnabas' testimony concerning appellant's pain and the use of sedatives therefor is not "substantial evidence" since he was unqualified in that regard.

The Secretary recognized Mr. Barnabas' incompetency on such matters in the letter of instructions the hearing examiner mailed Barnabas prior to the hearing. That letter contains the following: "You will not be requested to express any opinion respecting the claimant's physical or mental impairments or his residual dysfunction, since these are matters calling for medical expertise."

■ Considering the views we have expressed and "on the basis of the medical evidence submitted tending to establish [appellant's] disability and the lack of contrary medical evidence * * *

the Secretary's decision was not supported by substantial evidence." Celebrezze v. Warren, 10 Cir., 339 F.2d 833, 838.

The judgment is reversed and the case is remanded to the District Court with directions to remand the same to the Secretary for a rehearing and for the entering of new findings of facts in conformity herewith. At such rehearing both the claimant and the Secretary should be permitted to introduce any additional competent and relevant evidence available.